UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

JARED McGRIFF, OCTAVIA YEARWOOD, and
RODNEY JACKSON,

    Plaintiffs,

v.

CITY OF MIAMI BEACH,

DAN GELBER, in his official capacity as Mayor
of the City of Miami Beach, and in his individual
capacity, and

JIMMY MORALES, in his official capacity as
City Manager of the City of Miami Beach, and
in his individual capacity,

    Defendants.
_____/

## COMPLAINT

Plaintiffs, JARED McGRIFF, OCTAVIA YEARWOOD, and RODNEY JACKSON hereby sue Defendants CITY OF MIAMI BEACH, DAN GELBER, and JIMMY MORALES and allege as follows:

## INTRODUCTION

1. In the Spring of 2019, the City of Miami Beach ("City") decided to create a series of art installations for display on Miami Beach during that year's Memorial Day Weekend. Calling the project "ReFrame Miami Beach," the City expected that the installations would promote conversations about race relations on Miami Beach.

2. The history of race relations on Miami Beach is an ugly one. Until the 1960s, Miami Beach enforced many of the same racist Jim Crow policies that were, for all practical

purposes, indistinguishable from those of the states of the Deep South. Among other things:

    a. During most of the first half of the 20th century, Black people were not permitted to live on Miami Beach.

    b. Beginning in the 1930s, Black people who worked on Miami Beach were required to register with the police, be fingerprinted and photographed, and carry identity cards.

    c. Until the civil rights protests of the 50s and 60s, Black people were not allowed to swim at the City's public beaches.

    d. Audiences in Miami Beach theatres and night clubs were strictly segregated into the 1950s.

    e. Miami Beach police regularly arrested interracial couples until the U.S. Supreme Court declared the practice unconstitutional.

    f. Black entertainers were not permitted to perform at Miami Beach hotels until the 1950s.

    g. Even then, they were not welcome to stay at hotels on the Beach, so when Muhammad Ali won the heavyweight championship at the Miami Beach Convention Center in 1963, he and his support staff were required to leave Miami Beach and stay at an historically Black motel in Miami.

3. In recent years, the response of local law enforcement to the celebration of Memorial Day, which, on Miami Beach, had come to be known as Urban Beach Weekend ("UBW"), was a reminder of that ugly history. Over the past decade, tens of thousands of students and other young people, most of them Black and Latino, have come to Miami

Beach during UBW. The massive presence of police officers, and their aggressive tactics during those weekends, were widely criticized as racially discriminatory by civic organizations and the media.

4. It was against this background that plaintiffs Jared McGriff and Octavia Yearwood, both of whom are art curators, were engaged by the City to create a number of art installations on the subject of race relations on Miami Beach during the 2019 UBW from May 23-27.

5. One of those installations was planned for Lincoln Road, where the curators installed a number of art works, including a painting by plaintiff Rodney Jackson. Jackson's painting depicted a man named Raymond Herisse, a Haitian-American man who was killed in a hail of police bullets on South Beach in 2011.

6. The day after the Herisse painting was mounted, a City official advised the curators that Jackson's painting had to be removed because the police objected to it. If it was not, he warned that the entire Lincoln Road installation would be closed.

7. Mayor Dan Gelber has publicly acknowledged that he and City Manager Jimmy Morales ordered the Herisse painting taken down because they did not like its point of view, and that, since the City paid for it, the City was free to order its removal.

8. The actions of the defendants constituted viewpoint censorship and flatly violate the First Amendment.

9. This action is intended to redress the plaintiffs' First Amendment rights.

## JURISDICTION

10. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

11. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65. The federal rights asserted by plaintiffs are enforceable under 42 U.S.C. § 1983. An award of attorney's fees and costs is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

13. Plaintiff Rodney Jackson is a visual artist who has produced paintings and other artistic works for more than 25 years.

14. He currently lives in Coconut Grove, in Miami, Florida.

15. For about ten years during the 90s and the early 2000s, he illustrated a comic book called "The Adventures of Bibi and Friends" that celebrated the diversity of South Beach.

16. Plaintiff Jackson was also the curator and contributor for an exhibit entitled "The Force," which explored state-sanctioned police violence against people of color and which was displayed in the Kroma Gallery in Coral Gables in 2016.

17. Plaintiff Jared McGriff is an artist and marketing manager.

18. He lives in and has his studio on Miami Beach, Florida.

19. Plaintiff McGriff has had his own less than positive experiences with the Miami Beach Police Department and wanted to be involved in "ReFrame Miami Beach" as a step toward changing how black people are viewed on Miami Beach. Specifically, he wanted to use his experience in art and marketing to have another narrative available during UBW other than the militarized police presence during Memorial Day Weekend that had become common in the preceding years.

20. Plaintiff Octavia Yearwood is an artist, arts educator, and art curator.

21. Plaintiff Yearwood participated in the ReFrame project because she thought it might lead to an honest exploration of relations between people of color, both local residents and visitors, and Miami Beach officials.

22. Defendant City of Miami Beach is a municipality organized and existing under the laws of the State of Florida and located in Miami-Dade County, Florida. Under Florida law, it has the power to sue or be sued. *See* Art. VIII, § 2(b), Fla. Const.; § 166.021, Fla. Stat.

23. Defendant Dan Gelber is the Mayor of the City of Miami Beach. He is sued in his official and in his individual capacities.

24. Defendant Jimmy Morales is the City Manager of the City of Miami Beach. He is sued in his individual and in his official capacities.

## FACTS

22. In announcing the project, which the City itself named "ReFrame Miami Beach," the City said that "ReFrame sparks crucial conversations about inclusion, surveillance, and propaganda using the works of local artists, curators, and organizers." The theme of the event was to be "Trust as Currency."

23. In April 2019, Plaintiffs Yearwood and McGriff had discussions about the ReFrame project with two City employees in the City's Department of Tourism and Culture: Matt Kenney, who was its Director, and Brandi Reddick, who was the Department's Cultural Affairs Manager.

24. Soon thereafter, Plaintiffs Yearwood and McGriff submitted a proposal for the ReFrame project to which Reddick and Kenney responded enthusiastically, and Plaintiffs Yearwood and McGriff began working on the project.

25. Plaintiff Yearwood contacted Plaintiff Jackson and other artists about participating in the project.

26. On May 9, 2019, the City and plaintiff McGriff signed a Professional Services Agreement pursuant to which Quinn Projects, LLC, Plaintiff McGriff's production company, would provide certain services. Exhibit A to the Agreement, entitled "Scope of Services," described the artistic installations that Quinn Projects would develop. The Agreement, including Exhibit A, are provided as **Exhibit 1** to this Complaint.

27. Exhibit A stated that Quinn Projects "would provide the cultural programming for 'Trust as Currency' for Memorial Day Weekend, May 23-27, 2019."

28. "Trust as Currency" was the name that Plaintiffs McGriff and Yearwood had suggested to the City as a theme for the UBW arts events. The meaning of that theme was understood by both Plaintiffs and Defendants, namely, that trust was at the center of any meaningful discussion about race relations on Miami Beach.

29. Exhibit A noted that the arts installation that the Plaintiffs would exhibit at 737 Lincoln Road was to be called "I See You, Too," and it was described as an exhibition "about how propaganda and misinformation have compromised us."

30. In discussing what would be exhibited in the "I See You, Too" installation, Plaintiffs McGriff, Yearwood and Jackson stressed that their central commitment, in conformity with the purpose of Reframe, was depicting the truth about the City's historical relationship with the Black community, as well as to permit open and honest conversations about that history.

31. The Plaintiffs and one other artist created works for the Lincoln Road site that sought to fulfill that commitment. There were several sections in the Lincoln Road installation:

   a. In a section entitled "Miami Beach Visual Memoirs," there were several photographs of Black people who worked on Miami Beach, including one large photograph depicting a young Black man wearing an ID card with his name, photo, and fingerprint.

b. Plaintiff Jackson's "Memorial to Raymond Herisse," which is reproduced in **Exhibit 2** to this Complaint, was mounted on a separate wall. It was a large vinyl piece, measuring 4 feet by 4 feet**.** Hanging on the wall next to the painting was a description of the shooting of Herisse by Miami Beach police in 2011. That description is reproduced in **Exhibit 3** to this Complaint. In addition, candles had been placed below the image to convey the sense that the piece was intended as a memorial to celebrate the life of Raymond Herisse.

c. In another section, there was an audio recording of police radio chatter.

d. A video in another section depicted young Black men and women relaxing and enjoying themselves outdoors.

e. There was also a space in the installation, created by artist Loni Johnson, that was intended as a healing space. It contained items associated with ancestral and historical memory, including a poem, plants, sage, shells, and a statue of the Yoruba Goddess Yemaya. There were also chairs so that visitors, if they wanted, could sit, read, and reflect about the subject matter of the installation.

32. That the works exhibited in the "I See You, Too" installation were consistent with the City's understanding of the ReFrame project was confirmed in the days before UBW by Defendant Morales, who acknowledged that the purpose of ReFrame, was "to spark conversations about inclusion, Blackness and relationships through artistic media." https://www.miamitimesonline.com/lifestyles/more-art-for-urban-beach/article_ab60559c-6c23-11e9-8363-27a8eb44d162.html,

33. On Saturday morning, May 25, 2019, Matt Kenney spoke to Plaintiff Yearwood and advised her that the Police Department objected to "Memorial to Raymond Herisse" and that the

City required that the painting be taken down. He told her that, if the work was not taken down, the entire exhibit, "I See You, Too," would be closed.

34. That afternoon, Plaintiffs took down the painting. In its place, they posted a sign that read, "This artwork has been removed at the request of the Miami Beach Police."

35. A few days later, a city spokesperson sought to justify the City's actions in demanding the removal of "Memorial to Raymond Herisse." While conceding that the "purpose of the ReFrame cultural programming this past weekend was to create an opportunity for inclusiveness and mutual exchange," she said that the "City Manager felt that the panel in the one particular art installation regarding the incidents of Memorial Day weekend in 2011 did not achieve this objective." https://www.miaminewtimes.com/news/miami-beach-city-manager-asks-for-removal-of-artwork-memorializing-police-shooting-victim-11183147.

36. The spokesman did not explain why the Herisse painting did not satisfy what Morales had described as "the purpose of ReFrame," namely, "to spark conversations about inclusion, Blackness and relationships through artistic media."

37. On November 7, 2019, at a forum called "Community Night: For Freedoms Town Hall" at the Pérez Art Museum of Miami, an audience member, referring to the removal of the Herisse painting, asked Defendant Gelber about the "act of censorship" that had occurred the last Memorial Day weekend on Miami Beach.

38. Defendant Gelber explained that Defendant Morales made the decision. He made it clear that Defendant Morales did not base his decision on the failure of the painting to further ReFrame purposes. Rather, according to Defendant Gelber, Defendant Morales said, "I don't like it, and I don't want it." He also said that Defendant Morales thought he had the power to order the painting's removal for no other reason than "I'm paying for it."

39. Defendant Gelber conceded that he had the power to reverse Defendant Morales' decision, but he said that he in fact supported it. Defendant Gelber did not defend the removal of the Herisse painting on the basis that it failed to conform to the purpose of ReFrame.

40. Each of the Plaintiffs has suffered considerable emotional and psychological harm as well as damage to their reputations as a result of the Defendants' unconstitutional act of censorship.

## CAUSE OF ACTION

### First Amendment Violation

41. The City's unambiguous intention in promoting the ReFrame project was to encourage an open and honest dialogue about the history and current reality of race relations on Miami Beach. Both in its public announcements of the project, as well as in its contract with Quinn Productions, LLC, the City expressed its commitment to welcoming all points of view on the subject of race relations.

42. The public statements of Defendants Morales and Gelber make it clear that their decision to order that Plaintiff Jackson's Herisse painting be taken down was their discomfort with Plaintiff's viewpoint that police violence against members of the Black community remains an ongoing concern among Black people on Miami Beach.

43. In *Texas v. Johnson*, 491 U.S. 397 (1989), the Supreme Court held that "if there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea because society finds the idea itself offensive or disagreeable."

44. Not only does the First Amendment bar the government from prohibiting the expression of ideas it finds offensive, it bars the government from refusing to fund ideas merely because it finds them offensive. *Speiser v. Randall,* 357 U.S. 513 (1958). In other words, the government may not do indirectly what it cannot directly.

45. Defendants ordered that plaintiffs take down *Memorial to Raymond Herisse* because they were offended by the ideas conveyed by the painting.

46. The power to refuse to fund art because public officials find it offensive has been flatly rejected in two strikingly similar cases, one of which is from this Court:

    a. In *Cuban Museum of Arts & Culture v. Miami,* 766 F. Supp. 1121, 1127 (S.D. Fla. 1991), the City of Miami sought to evict the Museum because "members of the Miami City Commission were displeased, perhaps even offended" by the Museum directors' decision to exhibit works of Cuban artists who either lived in Cuba or had not denounced Fidel Castro. In holding that the directors' decision to exhibit the works was protected by the First Amendment, the court firmly rejected the idea that public officials can try to prevent the public display of art, even if the City pays for it, merely because they are "displeased" or "offended" by it.

    b. In *Brooklyn Institute for Arts and Sciences v. City of New York,* 54 F. Supp. 2d 184, 188 (E.D.N.Y. 1999), New York City threatened to terminate City funding to the Brooklyn Museum unless it canceled an exhibit containing works that then-Mayor Giuliani thought were "sick" and "disgusting" and "offensive to Catholics." In rejecting the Mayor's assertion, echoing Mayor Gelber's and City Manager Morales' here, that it could refuse to pay for art that it did not like, the court held, "In many different contexts, then, the Supreme Court has made clear that, although the government is under no obligation to provide various kinds of benefits, it may not deny them if the reason for the denial would require a choice between exercising First Amendment rights and obtaining the benefit." 54 F. Supp. 2d at 200.

47. In ordering that "Memorial to Raymond Herisse" be taken down because they did not like its point of view, Defendants violated the plaintiffs' First Amendment rights.

## RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Enter a judgment declaring that defendants violated plaintiffs' First Amendment rights by demanding that plaintiffs take down "Memorial to Raymond Herisse."

2. Issue a permanent injunction requiring that defendants display "Memorial to Raymond Herisse" in a public place comparable to the space in which it would have been displayed during Memorial Day weekend in 2019, and for a comparable period of time.

3. Award damages in an amount to be awarded after trial.

4. Award costs and attorney's fees pursuant to 42 U.S.C. § 1988;

5. Grant or award such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury on all issues so triable.

Date: June 23, 2020

        Respectfully submitted,

        **Valiente, Carollo & McElligott, PLLC**
        *Co - Counsel for the Plaintiffs*
        1111 Brickell Ave., Suite 1550
        Miami, Florida 33131
        Telephone No. (786) 361-6887
        Facsimile No. (786) 361-7470
        Primary Email: eservice@vcmlawgroup.com
        Secondary Email: matthew@vcmlawgroup.com
        Tertiary Email: dtilley@aclufl.org

        By: */s/ Matthew McElligott*
          Matthew McElligott, Esq.

>Florida Bar No. 69959
>Alan Levine, Esq.[1]
>New York Bar No. 1373554
>Cooperating Attorneys for the
>Greater Miami Chapter of the ACLU of Florida
>
>**ACLU Foundation of Florida**
>*Co - Counsel for the Plaintiffs*
>4343 West Flagler Street, Suite 400 Miami, FL 33134
>Telephone No. (786) 363-2714
>Facsimile No. (786) 363-1257
>
>/**s**/ *Daniel B. Tilley*____
>Daniel B. Tilley
>Florida Bar No. 102882
>dtilley@aclufl.org

---

[1] Pro hac vice status is being sought by Mr. Levine to appear as co-counsel in this case.