## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 1:20-cv-22583-COOKE

JARED MCGRIFF, OCTAVIA YEARWOOD,
NAIOMY GUERRERO, and RODNEY
JACKSON,

Plaintiffs,
v.

CITY OF MIAMI BEACH,

Defendant.

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment (the "Motion") (ECF 62), filed August 13, 2021. Plaintiffs filed their response in opposition to the Motion on August 27, 2021. ECF No. 75. Defendant filed its reply in support of the Motion on September 3, 2021. ECF No. 79. Accordingly, the Motion is ripe for adjudication.

The Court having reviewed the Motion, the briefing related thereto, the record, the relevant legal authorities, and being duly advised, finds, for the reasons discussed below, that the Motion should be granted.

### BACKGROUND

#### A. Procedural Background

This case was initially filed on June 23, 2020. ECF No. 1. When filed this case was assigned to the Honorable Ursula Ungarro, U.S. District Judge. In addition to Miami Beach being identified as a Defendant in this action, Plaintiffs' initial complaint and First Amended Complaint, also included the Mayor of Miami Beach (Dan Gelber) and the City Manager for Miami Beach (Jimmy Morales) as defendants in this action. The claims against Dan Gelber and Jimmy Morales were brought against them in their official and individual capacities. ECF No. 9, ¶¶ 23-24. Through her Order Granting in Part and Denying In Part Defendants Motion to Dismiss, Judge Ungaro dismissed Dan Gelber and Jimmy Morales from this action. *See* ECF No. 39. As such, Miami Beach is the sole remaining Defendant in this action.

After Judge Ungaro retired from the bench, this matter was re-assigned to the Undersigned.

### B. The Parties

Plaintiff Jared McGriff ("McGriff") is an artist and marketing manager. ECF No. 9, Am. Compl. ¶ 16. Plaintiff Octavia Yearwood ("Yearwood") is an artist, arts educator, and art curator. *Id.* ¶ 19. Plaintiff Rodney Jackson ("Jackson") is an artist and art curator. *Id.* ¶¶ 12, 15. Plaintiff Naiomy Guerrero ("Guerrero") is an art curator who, at the time of the events alleged in the First Amended Complaint, was a curatorial fellow at the Pérez Art Museum of Miami ("PAMM"). *Id.* ¶ 21. The Plaintiffs shall be collectively referred to herein as "Plaintiffs".

Defendant City of Miami Beach (the "City", "Miami Beach", "Defendant", or "Defendant Miami Beach") is a municipality organized and existing under the laws of the State of Florida and located in Miami-Dade County, Florida. *Id.* ¶ 22.

### B. ReFrame Miami Beach

According to the First Amended Complaint, Miami Beach has an ugly history of racism, segregation, and discrimination. *See id.* ¶ 2. In recent years, the response of local law enforcement to the celebration of Memorial Day, which, on Miami Beach, has come to be known as Urban Beach Weekend ("UBW"), has reminded some of that troubled history. *Id.* ¶ 3. Over the past decade, tens of thousands of students and other young people, most of them Black and Latino, have come to Miami Beach during UBW. *Id.* ¶ 3. During UBW in 2011, Raymond Herisse ("Herisse"), a Haitian-American man, was shot and killed by Miami Beach police officers. *Id.* ¶ 5; *see also* ECF No. 21-1.

In the Spring of 2019, the City decided to fund the creation of a series of art installations for display on Miami Beach during that year's UBW. ECF No. 9, Am. Compl. ¶ 1. Calling the project "ReFrame Miami Beach," the City said that "ReFrame sparks crucial conversations about inclusion, surveillance, and propaganda using the works of local artists, curators, and organizers." *Id.* ¶ 25. The theme of the event was to be "Trust as Currency." *Id.*

In April 2019, Plaintiffs McGriff and Yearwood discussed ReFrame Miami Beach with two City employees in the City's Department of Tourism and Culture: Director Matt Kenney ("Kenney") and Cultural Affairs Manager Brandi Reddick ("Reddick"). *Id.* ¶ 26. McGriff and Yearwood began working on the project shortly thereafter and contacted others

in the arts community, including Jackson and Guerrero, to participate in the project. *Id.* ¶¶ 27-28.

On May 9, 2019, McGriff and the City signed a Professional Services Agreement pursuant to which Quinn Projects LLC, McGriff's production company, would provide certain production services. *Id.* ¶ 29; ECF No. 9-1. The same day, Yearwood and the City signed a Professional Services Agreement pursuant to which Team Ohhh LLC, Yearwood's production company, would provide certain production services. ECF No. 13-2. The two Professional Services Agreements are essentially identical and will be referred to herein as the "Agreement" for ease of reference. The Agreement refers to Quinn Projects LLC and Team Ohhh LLC as the Consultant(s), and states "[f]or the purposes of this Agreement, Consultant shall be deemed to be an independent contractor . . . of the City." ECF No. 9-1 at 1; ECF No. 13-2 at 1. Under the Agreement, Quinn Projects LLC and Team Ohhh LLC were to co-produce the Project described in Exhibit A. ECF No. 9-1 at 2; ECF No. 13-2 at 2. Exhibit A, titled "Scope of Services," states that Quinn Projects LLC and Team Ohhh LLC "would provide the cultural programming for 'Trust as Currency' for Memorial Day Weekend, May 23–27, 2019." ECF No. 9-1 at 13; ECF No. 13-2 at 13. Exhibit A noted that the art installation that the Quinn Projects LLC and Team Ohhh LLC would exhibit at Lincoln Road in an "empty storefront" was to be called "I See You, Too," which was to be "about how propaganda and misinformation have compromised us." ECF No. 9-1 at 13; ECF No. 13-2 at 13. The City entered into a Temporary License Agreement with a third-party limited liability company, whereby the licensee City agreed to license the privately-owned building located at 737 Lincoln Road, Miami Beach, Florida 33139, from May 6, 2019 through May 31, 2019, "for the sole purpose of gallery exhibits." ECF No. 13-5.

Section 2.1 of the Agreement provides that "all services provided by the Consultant shall be performed in accordance with the Proposal and to the reasonable satisfaction of the City Manager." *Id.* Exhibit A states that "[a]ll installations shall be subject to review and approval by the City Manager's designee." ECF No. 9-1 at 13; ECF No. 13-2 at 13. Section 9.3, titled "Patent Rights; Copyright; Confidential Findings," states that any work produced for the exhibits and installations "are intended to be the sole and exclusive property of the City" and "shall not otherwise be made public and/or disseminated by Consultant, without the prior written consent of the City Manager." *Id.* at 7.

Under the Agreement, the *I See You, Too* installation was to be co-curated by Yearwood and Guerrero; the Agreement does not mention Jackson. ECF No. 9-1 at 13; ECF No. 13-2 at 13. In discussing what would be exhibited in *I See You, Too*, Plaintiffs stressed that their central commitment, in conformity with the purpose of ReFrame, was depicting the truth about the City's historical relationship with the Black community, as well as to permit open and honest conversations about that history. ECF No. 9, Am. Compl. ¶ 34.

### C.    The Herisse Memorial

Plaintiffs curated and/or created works for *I See You, Too* in accordance with the Agreement. *Id.* ¶ 35. There were several sections in *I See You, Too*, including a "Memorial to Raymond Herisse" painting (the "Herisse Memorial"), which Jackson created. *Id.*; ECF No. 9-2. The Herisse Memorial included a 4x4 foot vinyl portrait, with written text next to it stating the following:

> Haitian-American Raymond Herisse was 22 years old when he was shot to death by Miami Beach and Hialeah police officers on Collins Avenue during Urban Beach Week in 201[1]. 116 shots were fired by the police, four bystanders were wounded, and 12 police officers participated in the shooting. Police suggested Herisse was firing a gun from his vehicle, gunshot residue tests released years later proved Herisse never fired a weapon that day. An examination of the record by The Miami Herald found the police narrative inconsistent, contradictory, and missing key information. His shooting changed the way Miami Beach police now interact with motorists, as now they cannot shoot into a moving vehicle unless someone inside the vehicle displays a weapon or fires first. This memorial is to honor Herisse, to affirm #blacklivesmatter and call into question the excessive force, racial discrimination, violence, and aggression often present in interactions between police and unarmed black civilians.

ECF No. 9-3 (copy of description). *See also* Am. Compl, ¶ 35(b) (referring to description in ECR No. 9-3). "In addition, candles had been placed below the image to convey the sense that the piece was intended as a memorial to celebrate the life of Raymond Herisse." *Id.*

On May 25, 2019, Kenney spoke to Yearwood and advised that the Miami Beach Police Department objected to the Herisse Memorial and that the City required that the Herisse Memorial be taken down, and that if it was not taken down, the entire *I See You, Too* installation would be closed. *Id.* ¶¶ 37. That afternoon, Plaintiffs took down the Herisse Memorial. *Id.* ¶ 38. In its place, they posted a sign that read, "This artwork has been removed at the request of the Miami Beach Police." *Id.*

A few days later, a City spokesperson commented on the removal of the Herisse Memorial. *Id.* ¶ 39. While stating that the "purpose of the ReFrame cultural programming this past weekend was to create an opportunity for inclusiveness and mutual exchange," the spokesperson said that the "City Manager felt that the panel in the one particular art installation regarding the incidents of Memorial Day weekend in 2011 did not achieve this objective." *Id.* (quoting Jessica Lipscomb, Miami Beach Censors Black Artist's Tribute to Police-Shooting Victim, MIAMI NEW TIMES (May 29, 2019 8:04 a.m.), https://www.miaminewtimes.com/news/miami-beach-city-manager-asks-for-removal-ofartwork-memorializing-police-shooting-victim-11183147).

On November 7, 2019, at a forum called "Community Night: For Freedoms Town Hall" at PAMM, an audience member, referring to the removal of the Herisse Memorial, asked Mayor Gelber about the "act of censorship" that had occurred the last Memorial Day weekend on Miami Beach. *Id.* ¶ 41. Mayor Gelber explained that City Manager Morales made the decision to take down the Herisse Memorial. *Id.* ¶ 42. According to Mayor Gelber, City Manager Morales said, "I don't like [the Herisse Memorial], and I don't want it." *Id.* He also said that City Manager Morales thought he had the power to order the painting's removal because the City was "paying for it." *Id.* Mayor Gelber stated that he supported City Manager Morales's decision and would not reverse it, although he had the power to do so. *Id.* ¶ 43.

### D. Plaintiffs' Cause of Action

In their First Amended Complaint, Plaintiffs bring one claim pursuant to 42 U.S.C. § 1983. *Id.* ¶ 11. In doing so, Plaintiffs allege that Miami Beach's actions violated their First Amendment rights and amounted to unconstitutional viewpoint censorship. *See Id.* ¶ 51. Plaintiffs ask the Court to: (1) enter a judgment declaring that Miami Beach violated their First Amendment rights by demanding that Plaintiffs take down the Herisse Memorial; (2) issue a permanent injunction requiring that Miami Beach display the Herisse Memorial in a public place comparable to the space in which it would have been displayed during Memorial Day weekend in 2019, and for a comparable period of time; (3) award Plaintiffs compensatory damages in an amount to be determined at trial; (4) award costs and attorney's fees pursuant to 42 U.S.C. § 1988; and (5) grant or award such other relief as this Court deems just and proper. *Id.* at 11.

## LEGAL STANDARD

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* Rule 56, moreover, "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

Aɴᴀʟʏsɪs

Defendant Miami Beach argues that it is entitled to summary judgment because Plaintiffs' claim does not implicate First Amendment rights due to the government speech doctrine.[1] ECF No. 62 at p. 3. Meanwhile, Plaintiffs argue that Defendant Miami Beach is not entitled to summary judgment as ReFrame was not government speech because: 1) the review and approval language in the Agreement did not give the City the right to control the content of the art exhibited during ReFrame; 2) the history of art does not indicate that ReFrame was government speech; and 3) a reasonably informed observer would not believe that the City endorsed the art exhibited as part of ReFrame. ECF No. 75.

The Parties agree that the standard this Court should follow to resolve the government speech inquiry in this case was that articulated by the U.S. Supreme Court in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

### I. Plaintiffs' Claim Does Not Implicate First Amendment Rights Because Government Speech is Not Subject to First Amendment Scrutiny

The Free Speech Clause of the U.S. Constitution does not regulate government speech. *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *see also Johanns v. Livestock Marketing Ass'n*, 544 550, 553 (2005) ("Government's own speech . . . is exempt from First Amendment scrutiny."). When the government exercises 'the right to speak for itself,' it can freely 'select the views that it wants to express.'" *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting *Summum*, 555 U.S. at 467); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213–14 (2015). "This freedom includes choosing not to speak and speaking through the removal of speech that the government disapproves." *Mech*, 806 F.3d at 1074 (citations, alterations, and quotation marks omitted). Further, "[w]hen . . . the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-

---

[1] Defendant also argues that Plaintiffs' claim does not implicate First Amendment rights due to the employee speech doctrine as their alleged protected expression was made pursuant to their official duties as contractors and subcontractors of the City; however, because the Court finds that ReFrame Miami Beach constituted government speech, it will not reach Defendant's employee speech arguments.

speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Johanns*, 544 U.S. at 562 (ruling that the message set out in beef promotions pursuant to the Beef Promotion and Research Act of 1985, 7 U.S.C. § 2901 *et seq.*, was government speech even though the government solicited assistance from a nongovernmental source (various cattle farmer associations) in developing specific messages, and rejecting the associations' contention that the federal beef program did not qualify as government speech because it was funded by a targeted assessment of beef producers rather than by general revenues).

The U.S. Supreme Court's decisions in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) have looked to three factors in identifying government speech: (1) history, (2) endorsement, and (3) control. *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215, 1223 (11th Cir. 2019); *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) ("*Walker* and *Summum* discuss three factors relevant to identifying government speech: (1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech."). As such, the Court's analysis here will be framed around these three factors.

### A.    Control Factor Weighs in Favor of the City

The control factor asks whether the government "maintains direct control over the messages conveyed" through the speech in question. *Walker*, 576 U.S. at 213 (holding that the government had control over the message (license plate designs) pursuant to state statute that gave them "final approval authority" over their selection).

Whether the government has the power to approve certain speech is the defining inquiry in evaluating the control factor. In *Summum*, the Supreme Court held that the city's rejection of a religious organization's request to erect a monument at a city park did not violate the Free Speech Clause because the city's decision was best viewed as a form of government speech. *Summum*, 555 U.S. at 467. In reaching this conclusion, the Court noted that the city had "rules governing the acceptance of artwork for permanent placement in city parks," and requiring approval of the finished product before any piece of art would be accepted. *Id.* at 472.

Similarly, the U.S. Supreme Court, in *Walker*, ruled that the Texas Department of Motor Vehicles Board's rejection of a proposed specialty license plate design featuring a Confederate battle flag did not violate the Free Speech Clause because specialty license plates conveyed government speech. 576 U.S. at 213–14. Like the city in *Summum*, the state of Texas in *Walker* expressly reserved "final approval authority" over all license plate designs and would reject designs inconsistent with how the state chose "to present itself and its constituency." *Id.* at 213.

In another analogous case, *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), the Court ruled that the federal government's marketing of beef and beef products amounted to government speech because the government set the overall message to be communicated and approved the words disseminated. *Johanns*, 544 U.S. at 561-562. More specifically, the Court found that the government exercised final statutory approval authority over the promotional campaign because "[a]ll proposed promotional messages [were] reviewed by Department officials both for substance and for wording," which indicated that the government was in full control and was truly the speaker. *Id.* at 561.

In *Mech v. School Board of Palm Beach County*, 806 F.3d 1070 (11th Cir. 2015), the Eleventh Circuit followed the framework laid out in *Summum* and *Walker* and deemed the removal of banners on public school property as government speech because "final approval authority" pursuant to a school board policy allowed the school "to choose how to present itself to the community. Such authority ensured that the messages on the banners are 'effectively controlled' by the schools." *Mech*, 806 F. 3d at 1078 (quoting *Summum*, 555 U.S. at 473). The schools had approval authority over the banners' design, typeface, color, contents, size, and location, including mandating that the school's initials and the phrase "Partner in Excellence" appear on each banner. *Id.*

In the instant case, Plaintiffs contend that Defendant Miami Beach cannot satisfy the control factor because the control factor is satisfied "only when the government, either by practice or by explicit language, demonstrates an intent to approve the message at issue." ECF No. 75 at p. 6. The Court, however, does not find this argument to be persuasive: as discussed below, the contract gave the City the power to approve and review the art, and Plaintiffs cite no authority indicating that the government *must* follow a formal explicit process or practice when deciding whether to exercise control over its own speech. Moreover, in *Summum*, the

U.S. Supreme Court expressly rejected the notion that a governmental entity must adopt a formal process when deciding how to control its own speech. *See Summum*, 555 U.S. at 473 (stating "Respondent voices the legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint. Respondent's suggested solution is to require a government entity accepting a privately donated monument to go through a formal process of adopting a resolution publicly embracing 'the message' that the monument conveys. . . . We see no reason for imposing a requirement of this sort. . . . The parks of this country contain thousands of donated monuments that government entities have used for their own expressive purposes, usually without producing the sort of formal documentation that respondent now says is required to escape Free Speech Clause restrictions. Requiring all of these jurisdictions to go back and proclaim formally that they adopt all of these monuments as their own expressive vehicles would be a pointless exercise that the Constitution does not mandate."). As such, the Court finds Plaintiffs' argument to the contrary to be unavailing.

Here, the Agreement gave the City control over the message intended to be conveyed in the *I See You, Too* installation. The Agreement provides that "[a]ll installations shall be subject to review and **approval** by the City Manager's designee." ECF No. 9-1 at p. 13 (emphasis added). Under section 2.1 of the Agreement, all services were to be performed to "the reasonable satisfaction of the City Manager." *Id.* at p. 2. In addition to the "review and approval" language contained within Exhibit A to the Agreement, the full text of Section 9.3 of the Agreement states:

> Any work product arising out of this Agreement, as well as all information specifications, processes, data and findings, are intended to be the property of the City and shall not otherwise be made public and/or disseminated by Consultant, without the prior written consent of the City Manager, excepting any information, records, etc. which are required to be disclosed pursuant to Court Order and/or Florida Public Records Law.

ECF No. 9-1 at p. 7. Thus, Section 9.3 broadly grants ownership rights of the work product arising out of the Agreement to the City and even prohibits publication of any works arising out of the Agreement without the prior written consent of the City Manager. Accordingly, the Court finds that the City had the authority to review and approve works arising out of the Agreement given that under the terms of the Agreement those works could not be made public or disseminated without

the City Manager's prior written consent (Section 9.3), the installations were subject to review and approval by the City Manager's designee (Agreement, Ex. A), and the services performed under the Agreement were to be performed to the reasonable satisfaction of the City Manager (Section 2.1).

Nonetheless, in their opposition to the City's Motion, Plaintiffs argue that the Plaintiffs "never believed that their artistic choices would be subject to City approval, and that they would never have signed the contract had the City demanded that power." ECF No. 75 at p. 2 (citing McGriff Affidavit at ¶ 5). Plaintiffs also argue:

> The City's argument that the contract with the Plaintiffs gave it the right of content approval over their art is not only contradicted by the City's own employees and by the curators, but it is belied by the terms of the contract that the City signed with a production company, RER Consulting Enterprise LLC, prior to contracting with Yearwood and McGriff. ECF 63 Ds SOF ¶ 7) [sic.] That contract contained the following provision: "Any event, including cultural programming produced by Producer during Memorial Day Weekend, pursuant to this Agreement, is subject to the prior written approval of the City Manager." ECF 63 Ds SOF ¶ 8. By virtue of that provision, "the City explicitly retained complete editorial control over all aspects of the event." Id. The contrast in the language used in the RER contract and the Plaintiffs' contract concerning "approval" is stark. Instead of stating that all "cultural programming" shall be "subject to the prior written approval of the City Manager," Exhibit A of the Plaintiffs' contract says: "All installations shall be subject to review and approval by the City Manager's *designee*." (emphasis added). Had the City wanted the City Manager to retain editorial control over the cultural programming – including individual works of art – produced by McGriff and Yearwood, the RER contract provided the language to accomplish that purpose. Instead, the City confined "review and approval" to the "installations" and gave that responsibility, not to the City Manager, but to his designee. The curators interpreted that to mean "practical matters" such as "timing, cost, staffing, and publicity, among others." ECF 24-1McGriff Aff. ¶ 9. As for the artistic decisions, Kenny agreed that "it was up to the curators to flesh out all of the programming for the entire weekend." ECF 60-6 Kenny Depo. at p. 34. The "review and approval" language of Exhibit A simply had nothing to do with individual works of art.

ECF No. 75 at 3-4.

This argument while novel misses the mark. In essence, Plaintiffs ask the Court to go beyond the plain language of the Agreement and rely on deposition testimony and McGriff's affidavit to discern the Parties' true intent; however, Plaintiffs provide no legal reason that

would justify the Court looking beyond the plain meaning of the terms of the Agreement and
its exhibits.

"Under general principles of contract interpretation, '[t]he plain meaning of a contract's
language governs its interpretation.'" *Davis v. Valsamis, Inc.*, 752 F. App'x 688, 692 (11th Cir. 2018)
(quoting *In re FFS Data, Inc.*, 776 F.3d 1299, 1305 (11th Cir. 2015) (internal quotation marks
omitted)). "[A] document should be read to give effect to all its provisions and to render them
consistent with each other." *Id.* (internal quotation marks omitted) (citing Restatement (Second) of
Contracts § 203(a) (Am. Law. Inst. 1981)). "The elementary canon of interpretation is, not that
particular words may be isolatedly considered, but that the whole contract must be brought into
view and interpreted with reference to the nature of the obligations between the parties, and the
intention which they have manifested in forming them." *Id.* (quoting *O'Brien v. Miller*, 168 U.S. 287,
297 (1897)). "Thus, courts look to 'the contract as a whole to determine whether it unambiguously
states the parties' intentions.'" *Id.* (quoting *Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 716
(8th Cir. 2003) and citing *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014)
(stating "Traditional contract-interpretation principles make contract interpretation a question of
law, decided by reading the words of a contract in the context of the entire contract and construing
the contract to effectuate the parties' intent.")). "A contract provision is ambiguous if it 'is
susceptible to two or more reasonable interpretations that can fairly be made.'" *Id.* (quoting *Dahl-
Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993)).

Here, Plaintiffs have not provided a legal basis for the Court to find the Agreement and its
exhibits ambiguous. Indeed, Plaintiffs do not cite to any case law or other legal authority that would
warrant the Court's consideration of parol evidence in this case.

**B.      History Factor Weighs in Favor of the City**

The history factor requires the court to consider whether the medium under scrutiny
has traditionally "communicated messages" on behalf of the government. *Walker*, 576 U.S.
at 211. Here, the City argues "history favors the determination of government speech because
the use of art as a form of government speech began in ancient history and continues until
today." ECF No. 62 at p. 8. In support of this argument, the City relies upon the Expert
Report of Dr. Thomas Folland, Ph. D, an Associate Professor of Art History at Los Angeles
Mission College. In his Report, Dr. Folland opined:

The use of art as a form of government speech begins in ancient history

> and continues until the modern period. For a large part of its history, the
> purpose of art was government speech. Specifically, the use of visual
> culture (whether it be paintings and sculptures or more recent forms of art
> like installation or multi-media artwork) by ruling bodies to communicate
> government-sponsored "messages." Ancient societies of various world
> cultures used art to commemorate rulers; to honor exemplary citizens or
> victorious warriors; to disseminate information; to advocate or even warn
> potential enemies or invaders; to convey laws and rules of civil society;
> and even to provide models for education and moral instruction as well
> as religious instruction. In the modern period, the rise of art as a form of
> private expression did not supplant the ancient practice of art as
> government speech; private art co-exists with public art as can be seen in
> numerous official portraits of government officials, historical figures, and
> other people of note whose likeness are set up in public parks, government
> buildings, or on commemorative stamps. Modern Governments often
> appropriate private art to speak on behalf of government in international
> art fairs and biennials, or for local cultural events.

ECF No. 54-1 at p. 4. Dr. Folland's Report further provides "an overview of artistic works
from ancient culture through the present day in order to highlight their role as a form of
government speech and details of the specifics, whenever possible, of their commission,
message, and outcome when controversy is sparked." *Id.* To this point, a portion of Dr.
Folland's Report provides an analysis of government sponsored artwork throughout history.
*See id.* pp. 4-7.

     In addition to the above, Dr. Folland's Report goes on to analyze other government-
sponsored art throughout history including Florida-based art programs like Florida's Art in
State Buildings Program and the Florida Artists Hall of Fame. And, specifically with respect
to the City of Miami Beach, Dr. Folland's Report states:

> The City of Miami Beach has a long and rich history of using artistic
> works as government speech by commissioning works over which it
> retains approval authority. . . . Art in Public Places is a City of Miami
> Beach program for curating and commissioning public art. The program
> was created in 1984, with its ordinance adopted in 1995. The program
> allocates funds totaling 2% of hard costs for City Projects and joint
> private/public Projects. Appointed by the City Commission, the AiPP
> Committee's seven members serve in an advisory capacity to the Mayor
> and City Commission. Artworks commissioned by the City of Miami
> Beach Art in Public Places are intended to add value to the public art
> collection, attract international attention and celebrate the diversity and
> heritage of Miami Beach. . . . Memorial Art is another form of art as
> government speech in Miami Beach. Miami Beach has several spanning

decades. The most recent is a commemorative portrait bust, erected in 2018, of Barbara Baer Capitman, a writer, artist, and preservationist who was the founder of the Miami Design Preservation League and led the crusade to establish the Miami Beach Art Deco District. Her realist-style portrait bust is displayed on Ocean Drive north of 13th Street. A relief sculpture as part of a plaque commemorates Melvin J Richard, who had emigrated to Miami Beach in 1926 and eventually became the city's Mayor, is on Collins Avenue south of 22nd Street. Nearby is a portrait bust of Simón Bolívar (erected 1997) atop a stone bock with a commemorative plaque attached that lists the names of elected officials of Miami beach, the Latin Chamber of Commerce, and a committee of private citizens, along with a dedication. Known as "El Libertador," he was a  Venezuelan military and political leader. Almost identical to Bolivar's is portrait dedicated to José Martí (erected 1986), who had unified the Cuban émigré community in Florida. Carlos J. Finlay Marker, (erected 1949), the Cuban scientist who discovered the transmission of yellow fever and a commemorative plaque and abstract sculpture of Jackie Gleason, the comedian in whose name the City Commission, in 1987, voted to rename the Miami theater. These commemorative portraits range in style but are consistent in the fact that they are all examples of art as government speech in the City of Miami Beach.

*Id.* at p. 15. Importantly, Dr. Folland concluded that "the ReFrame Festival, generally, and the *I See You, Too* installation specifically, including its Memorial to Raymond Herisse, was consistent with this history of artwork as government speech in that the City of Miami Beach contracted to commission, fund, and own the artwork, contracted to control its exhibition, contracted to control the space in which the exhibition was housed, publicized the event through City press releases, and identified it as a City event." *Id.* at p. 16.

In their opposition, Plaintiffs do not dispute Dr. Folland's findings with respect to the specific pieces of art that he analyzed in his report. Instead, Plaintiffs argue "[t]he Parties, and their respective experts, agree that art has sometimes been used to convey a government message and that art has sometimes been a medium for personal expression. But the history factor does not look to how the medium has 'sometimes' been used, but how it has been 'traditionally' used. . . . While the Court has not explained what it means by 'traditionally,' the word comes from 'tradition,' which implies 'customary.' Despite all the examples of government messaging through art cited by the City, it is not plausible to suggest that government messaging has been the 'customary' purpose of art." ECF No. 75 at p. 8.

Plaintiffs' contention ignores the plain language of the cases discussing the history

factor with respect to government-sponsorship. *Summum*, *Walker*, and their progeny do not require a court to determine whether the customary purpose of the medium itself is government messaging. Rather, the relevant inquiry is whether the government has historically or traditionally used the medium for government messaging. To be clear, in *Summum*, the U.S. Supreme Court did not hold that monuments in and of themselves constituted government speech. Nor did it consider the "customary purpose" of monuments. Instead, there, the Court analyzed the history of governmental use of monuments. In doing so, the Court stated:

> Governments have long used monuments to speak to the public. Since ancient times, kings, emperors, and other rulers have erected statues of themselves to remind their subjects of their authority and power. Triumphal arches, columns, and other monuments have been built to commemorate military victories and sacrifices and other events of civic importance. A monument, by definition, is a structure that is designed as a means of expression. When a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure. Neither the Court of Appeals nor respondent disputes the obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech.

*Summum*, 555 U.S. at 470. Thus, the Court's analysis focused on the government's historical use of monuments. Accordingly, Plaintiffs' argument fails.

Likewise, Plaintiffs' contention that the Court should only consider modern uses of art in evaluating the history factor fails. Plaintiffs urge the Court to adopt this limiting analysis but fail to provide any legal basis for doing so. And this is contrary to the fact that in its 2009 decision in *Summum* the U.S. Supreme Court considered the governmental use of monuments dating back to ancient times. Thus, as recently as 2009, the U.S. Supreme Court did not adopt the limited view of modern uses of mediums that Plaintiffs argue is applicable here. As such, this Court will not adopt such a limited view of government-sponsored art here.

The Court notes that the Eleventh Circuit has recognized that "a medium that has long communicated government messages is more likely to be government speech . . . but a long historical pedigree is not a prerequisite for government speech." *Mech*, 806 F.3d at 1075 (citing *Summum*, 555 U.S. at 470; *Johanns*, 544 U.S. at 560–67). For example, in *Johanns*, the Supreme Court concluded that a promotional campaign for the beef industry was government speech

without conducting any historical inquiry or citing any historical evidence. *See Johanns*, 544 U.S. at 560–67. And, in *Mech*, which involved a school banner program, the Eleventh Circuit concluded that "[d]espite the lack of historical evidence in the record, the banners exhibit[ed] strong indicia of government endorsement and control." *Mech*, 806 F.3d at 1079. Accordingly, the Court recognizes that the history factor is not necessarily outcome determinative in this case.

### C.     Endorsement Factor Weighs in Favor of the City

The endorsement inquiry "asks whether the kind of speech at issue is 'often closely identified in the public mind with the government,' *Summum*, 555 U.S. at 472, or put somewhat differently, whether "observers reasonably believe the government has endorsed the message, *Mec*h, 806 F.3d at 1076." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1232–33 (11th Cir. 2019).

Defendant Miami Beach argues that the endorsement factor is satisfied because: 1) the event was named "Reframe Miami Beach"; 2) along with the "REFRAME MIAMI BEACH" logo, Defendant Miami Beach's official logo, "MIAMIBEACH", was featured on all things ReFrame Miami Beach; and 3) the City not only owned the artwork produced but also leased the storefront where *I See You, Too* was exhibited.[2] In opposition, Plaintiffs argue the City has not adduced sufficient evidence to support a finding of City endorsement of the *I See You, Too* exhibit and "[a] screenshot taken from a video created by the curators to document ReFrame shows the Lincoln Road entrance to *I See You, Too* and shows that there is nothing to indicate the City's involvement with the installation. Members of the public entering *I See You, Too*, therefore, would have had no reason to believe that the City was involved with the exhibition or endorsed the message of any of the art displayed inside." ECF No. 75 at p. 18. The Court disagrees.[3]

---

[2] The Court recognizes that an ordinary observer would not be aware of the terms of the Agreement or Defendant Miami Beach's Lease for 737 Lincoln Road. The Court notes that Defendant Miami Beach did not present it with public records indicating that the Agreement or the lease were the subject of public meetings, agenda items, or community town halls. As such, the Court will not consider such evidence in evaluating whether observers would reasonably believe Defendant Miami Beach endorsed the *I See You, Too* art installation.

[3] The Court is mindful of the time and effort that Plaintiffs put into making their artistic vision a reality and the positive impact that they hoped to achieve.

After reviewing the evidence adduced in this case, the Court finds that observers would reasonably believe that Defendant Miami Beach endorsed ReFrame Miami Beach and, thereby, the *I See You, Too* message as that installation was a component of ReFrame Miami Beach. This finding is based upon the following undisputed evidence:

- The event or festival in question was named "ReFrame Miami Beach". Am. Compl. at ¶ 25; *see also* ECF 64-7 at pp. 225-228; *id.* at 177:9-18.

- The front of advertisement flyers marketing the ReFrame Miami Beach's Opening Reception and Media Preview stated: "JOIN US FOR A SUNSET COCKTAIL AS THE CITY OF MIAMI BEACH AND REFRAME LAUNCH **THEIR IGNAUGURAL FESTIVAL**". ECF No. 18-1 (emphasis added).

- The back of the advertisement flyers marketing The ReFrame Miami Beach's Opening Reception and Media Preview listed the art installations including the *I See You, Too* installation. ECF No. 18-2.

- Defendant Miami Beach's logo was on the front and the back of the advertisement flyers marketing the ReFrame Miami Beach's Opening Reception and Media Preview. ECF No. 18-1 and 18-2.

- The advertisement flyers for the ReFrame Miami Beach's Opening Reception and Media Preview stated, "RSVP TO ARTSANDCULTURE@MIAMIBEACHFL.GOV". ECF No. 18-1.

- Yearwood admitted during her deposition that Defendant Miami Beach sent out all the press releases for the ReFrame Miami Beach. ECF No. 64-7, 110:10-13.

- Yearwood admitted that the press releases for the ReFrame Miami Beach were on City letterhead. *Id.* at 110:21-111:3, 111:23-112:22.

- Yearwood admitted that the press releases identified two City employees as the individuals to be contacted for more information about the ReFrame Miami Beach and the press releases provided their contact email addresses: "tonyadaniels@miamibeachfl.gov" and "melissaberthier@miamibeachfl.gov". *Id.* at 110:21-12.

- During her deposition, Yearwood discussed how she and the Mayor of Miami Beach were interviewed together by National Public Radio ("NPR") in relation to ReFrame Miami Beach. *Id.* at 200:13-201:2.

- Yearwood during her deposition admitted that she sent an email on May

15, 2019 in which she stated "I feel you all, it's been a mad dash. I've changed the Instagram handle to @Reframemb2 because just MB was not available. I've also sent a separate note to our team about it as well. I understood primarily that the logo for Miami Beach needed to be on all things, which it has been, I did not realize the title for the project I chose had to have Miami Beach in it, as it's just the title of the project." *Id.* at 106:18-107:1.

- The Instagram account for ReFrame Miami Beach posted promotional materials for the ReFrame Miami Beach cocktail reception which identified a City email address as the contact for reservations to the reception. Specifically, that email address was: "artsandculture@miamibeachfl.gov". *Id.* at 114:13-116:3.

- Defendant Miami Beach held an opening cocktail reception and media preview event for ReFrame Miami Beach. *Id.* at 115:10-116:3.

- The Instagram handle for the event was entitled "ReFrame Miami Beach". ECF 64-7 at pp. 225-228.

The above evidence is akin to the evidence that the Eleventh Circuit recently found to be sufficient to satisfy the endorsement factor for government speech in *Leake v. Drinkard*, 14 F.4th 1242 (2021). There, at issue was whether the City of Alpharetta, Georgia could restrict the Roswell Mills Camp Sons of Confederate Veterans' participation in its 67th Annual Old Soldiers Day Parade. *Id.* at 1245-46. To participate in the parade, private groups had to submit applications. *Id.* at 1246. The City of Alpharetta, based on the message that the mayor and city council wanted the parade to communicate, made the final decision as to whether an entity could participate in the parade. *Id.* at 1246. According to the Eleventh Circuit, after receiving the application from the Roswell Mills Sons of Confederate Soldiers, an administrator on behalf of the City of Alpharetta sent a letter to the Roswell Mills Camp Sons of Confederate Veterans group which stated:

> [T]he purpose of the Parade is to "unite our community" to "celebrat[e] American war veterans," and that, in the light of that purpose, "there is cause to question the appropriateness of participation by an organization devoted exclusively to commemorating and honoring Confederate soldiers[]". . . "the Confederate Battle Flag has become a divisive symbol that a large portion of our citizens see as symbolizing oppression and slavery." In the City's view, that divisiveness would draw "the spotlight away from the goals of the . . . Parade and the service of our American war veterans[]" . . . "the City of Alpharetta will maintain its decision, supported unanimously by Mayor Gilvin and the City Council, to not

> allow the Confederate Battle Flag to be flown in the Old Soldiers Day
> Parade."

*Id.* (alterations and internal citations omitted). Then, several days before the parade was set
to occur, two individuals on behalf of the Roswell Mills Camp Sons of Confederate Veterans
sued the City of Alpharetta for violating their free speech rights under the First and Fourteenth
Amendments. *Id.* at 1246-1247. The district court entered summary judgment in favor of the
City of Alpharetta and found that the parade constituted government speech. The Eleventh
Circuit affirmed the district court's summary judgment order. With respect to the
endorsement factor of its government speech analysis, the Eleventh Circuit concluded that
"[O]bservers [would have] reasonably believe[d] the government ha[d] endorsed the
[Parade's] message" because the City expressly and publicly did so." *Id.* at 1249 (alterations
in original) (citations omitted). In reaching this conclusion, the Eleventh Circuit noted:

> [t]he City publicly advertised and promoted the 2019 Parade on its
> website, where it identified itself and the Legion as co-hosts. The City
> publicly identified the "goal of th[e] parade" as the celebration of
> "American war veterans" and the recognition of "their service to our
> country." The City publicly endorsed the sentiment that "all war
> veterans, especially those from Alpharetta" should be "celebrate[d] and
> honor[ed]." And the City publicly advertised that the Parade would open
> with a performance by the City Band."

*Id.* at 1249. Further, the court found unavailing appellants' argument that the parade "being
'sponsored with both private and public money' is sufficient to make it private speech and
that 'the City [was] using its position as a majority-sponsor of the parade to regulate private
speech.'" *Id.* In that respect, in pertinent part, the Eleventh Circuit reasoned:

> [t]he fact that private parties take part in the design and propagation of a
> message does not extinguish the governmental nature of the message,"
> especially if, as here, the government is organizing and funding the event
> through which the message is communicated. . . . It is obvious, then, that
> observers would interpret a parade promoted, organized, and funded by
> the government "as conveying some message on [its] behalf."

*Id.* at 1249-1250 (quoting *Walker*, 576 U.S. at 512, 517).

     The Eleventh Circuit's reasoning in *Drinkard* applies equally here. As previously
discussed, in sum, the undisputed evidence establishes that: the name of the event in question,
"ReFrame Miami Beach", shows a strong correlation or association with Defendant Miami
Beach, Defendant Miami Beach hosted a cocktail reception for Re-Frame Miami Beach,

Defendant Miami Beach's logo was on the front and the back of the advertisement flyers marketing the ReFrame Miami Beach's Opening Reception and Media Preview, the logo for Defendant Miami Beach was supposed to be on all things related to ReFrame Miami Beach, Defendant Miami Beach sent out all the press releases for ReFrame Miami Beach and those press releases were sent out on City letterhead, and Yearwood along with the Miami Beach Mayor were interviewed together by NPR about ReFrame Miami Beach. As a result, the Court finds that the endorsement factor strongly weighs in favor of Defendant Miami Beach.

### CONCLUSION

Because, as discussed above, the Court finds that all three factors of the government speech analysis weigh in favor of Defendant Miami Beach, the Court finds that the ReFrame Miami Beach Event, including the *I See You, Too* installation, constituted government speech. *See Drinkard*, 14 F.4th at 1248 ("Although we lack a 'precise test,' . . . there are three factors we use to distinguish government speech from private speech: history, endorsement, and control[.] . . . These factors are neither individually nor jointly necessary for speech to constitute government speech. . . But a finding that *all* evidence government speech will almost always result in a finding that the speech is that of the government." (citations omitted and emphasis added). As a consequence, it is hereby **ORDERED and ADJUDGED** as follows:

1. Defendant City of Miami Beach's Motion for Summary Judgment (ECF 62) is **GRANTED**.

2. All pending motions not otherwise ruled upon herein are **DENIED AS MOOT**.

3. By separate order, the Court shall issue a final judgment in favor of Defendant City of Miami Beach.

4. The Clerk is directed to **CLOSE** this case solely for statistical purposes.

**DONE and ORDERED** in Chambers at Miami, Florida this 29th day of March 2022.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

*Copies furnished to:*

*All counsel of record*